**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**


**MICHAEL GARY BELAND,**

       *Plaintiff,*

**v.**                                         **CIVIL ACTION NO.: 1:14CV138**
                                                  **(KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       Defendant.


## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

On August 19, 2014, Plaintiff, Michael Gary Beland ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On November 25, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 8; Admin. R., ECF No. 9). On December 24, 2014, and January 16, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14).  Following review of the motions by the parties and the Administrative Record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. <u>PROCEDURAL HISTORY</u>

On September 10, 2010, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on November 23, 2009. (R. 325-31, 332-35). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through September 30, 2014; therefore, Plaintiff must establish disability on or before this date. (R. 163). The claims were initially denied on November 8, 2010 (R. 210, 215) and denied again upon reconsideration on April 14, 2011 (R. 221, 225). On May 9, 2011, Plaintiff filed a written request for a hearing (R. 228), which was held before United States Administrative Law Judge ("ALJ") Donna Davis on February 28, 2013 by video conferencing with the ALJ appearing in Richmond, Virginia. (R. 179-203). Plaintiff, represented by counsel Britt Clark, Esq., appeared and testified in Martinsburg, West Virginia. (R. 183-200). Ms. Coppard, an impartial vocational expert, appeared and testified in Richmond. (R. 200-02). On March 8, 2013, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 160-78). On June 25, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-6).

## III. <u>BACKGROUND</u>

### A.      Personal History

Plaintiff was born on April 17, 1971, and was thirty-nine years old at the time he filed his Social Security claims. (R. 325, 332). The highest grade Plaintiff completed in school was tenth grade and he never obtained his GED. (R. 320, 359). Plaintiff worked as a painter from 1986 to 2010. (R. 345). At the time he filed his initial claim, Plaintiff was single and had no dependent

children. (R. 326). Plaintiff alleges disability due to lumbar degenerative disc disease, diabetes with neuropathy, gout, and depression. (R. 390). Plaintiff's counsel argued that Plaintiff's impairments, and specifically his lower back pain, prevent him from engaging in sustained sedentary work. (Id.). Further, Plaintiff's counsel argued that Plaintiff's mental and physical limitations would limit his concentration and cause excessive breaks and absences, thus precluding him from gainful employment. (R. 391).

## B.     Medical History

### 1.     Medical History Pre-Dating Alleged Onset Date of November 23, 2009

On September 2, 2007, Plaintiff presented to City Hospital Emergency Room reporting a headache and vertigo. (R. 722-24). Plaintiff underwent a CT scan of his head without contrast. (R. 725). The scan results were normal. (Id.). Dr. Mongold advised Plaintiff that he may be experiencing a new onset of diabetes. (R. 723).

### 2.     Medical History Post-Dating Alleged Onset Date of November 23, 2009

On December 22, 2009, Plaintiff visited Washington County Hospital Emergency Room complaining of back pain. (R. 960). During the exam, Dr. Kinsey reports that Plaintiff stood up from the sitting position and felt a grinding pain shoot up his back, however Plaintiff did not lose control of his urine or bowels. (R. 961). Plaintiff's diagnoses included an acute lumbar strain and radiculopathy. (R. 962). Plaintiff was prescribed Percocet, Prednisone and Valium. (Id.).

On January 19, 2010, Plaintiff returned to the Washington County ER complaining of back and bilateral leg pain. (R. 957). Plaintiff injured his back one month prior and has suffered an increase in pain since the injury. (R. 958). The pain was described as a constant pain exacerbated by bending and lifting. (Id.). He denied numbness, tingling or weakness. (Id.).

Plaintiff's diagnoses were continued lower back sprain and spasms; he was prescribed pain medication. (Id.).

On January 26, 2010, Plaintiff returned to the Washington County ER with back pain. (R. 954). He reported a gradual mild to moderate pain that was aching and exacerbated by bending, walking and sitting. (R. 955). Plaintiff was diagnosed with sciatica and a lumbar strain. (R. 956)

On January 26, 2010, Plaintiff presented to the WVUH-East Emergency Room reporting back pain. (R. 428). The physical examination noted tenderness to palpation over the right SI joint, which reproduced pain down his right leg. (Id.). Dr. Stewart found Plaintiff was suffering from acute right-sided sciatica. (R. 429). Plaintiff was prescribed Flexeril and Norco. (Id.). Plaintiff was advised to apply heat to pain ridden area, to follow-up with primary care physician, and to return to the Emergency Department for worsening conditions or concern. (Id.).

On May 11, 2010, Plaintiff presented to the WVUH-East Emergency Room reporting back pain. (R. 715). Plaintiff reported continued discomfort located in his right SI joint radiating down to his right leg for the past six months. (Id.). The physical exam showed tenderness to palpation over the right SI joint. (Id.). Diagnoses included chronic back pain, non-insulin dependent diabetes and hypertension. (R. 716). Plaintiff was prescribed pain medication. (Id.).

On August 10, 2010, Plaintiff presented to the WVUH-East Emergency Room reporting acute exacerbation of lower back pain. (R. 712). Plaintiff reported that the lower back pain and tingling sensation down to his right foot began in November of last year; he stated the pain was worse with range of motion. (Id.). Plaintiff explained that he bent over to simply pet his grandmother's dog and immediately had a popping sensation in his lower back. (Id.). The physical examination noted no tenderness, he was able to bend over and touch his toes but was

somewhat slow coming back up and had increased discomfort with range of motion. (R. 713). Plaintiff was prescribed Percocet, Flexeril, and Voltaren for pain. (Id.).

On August 18, 2010, Plaintiff returned to the Washington County ER complaining of lower back pain that began three months prior. (R. 951-53). Plaintiff reported severe pain at a ten out of ten that was constant and exacerbated by bending. (R. 952). He also reported numbness (Id.). The physical examination noted that Plaintiff was in moderate distress with increase right lumbar tenderness. (Id.). Plaintiff was diagnosed with a lumbar strain and sciatica. (R. 953).

On August 19, 2010, Plaintiff returned to the Washington County ER with back pain lasting for over eight months. (R. 948-50). Plaintiff reported moderate sharp pain exacerbated with bending, lifting, walking and standing. (R. 949). The physical examination noted increased pain with range of motion of his back and positive right straight leg raise. (R. 950). Plaintiff's diagnosis was chronic back pain with sciatica. (Id.).

On August 21, 2010, Plaintiff was admitted to WVUH-East reporting severe low back pain with numbness on the right lower extremity. (R. 425). Plaintiff underwent an MRI. (R. 409, 431). The MRI results showed a one centimeter extruded disk protrusion at L4-L5. (Id.). The protrusion was compressing the spinal cord causing severe spinal stenosis and bilateral foraminal narrowing, slightly greater on the right than on the left. (Id.). Plaintiff was given Dilaudid for pain. (R. 426).

Dr. Yalamanchili conducted a neurosurgical consultation on August 24, 2010. (R. 421-22). The physical examination noted 5/5 motor exam and 4+/5 strength on the right; absent deep tendon reflexes in the knees and both ankles; and straight leg raise bilaterally at about sixty degrees. (R. 422). Plaintiff's diagnoses were lumbar disk displacement without myelopathy; lumbar radiculitis; and lumbar disk degeneration. (Id.). Dr. Yalamanchili recommended

conservation measures such as epidural steroids and physical therapy before considering a lumbar discectomy. (Id.). On August 25, 2010, Plaintiff underwent an epidural injection for back pain and radiculopathy. (R. 424). The procedure was repeated on the right side at the L5-S1 level. (Id.).

On August 25, 2010, Plaintiff was discharged from the hospital. (R. 409-11). His discharge diagnosis was intractable low back pain with L5-L5 bulge; confirmed by MRI showing one centimeter disk protrusion and spinal stenosis. (R. 409). Dr. Yalamanchili, a neurosurgeon, agreed to follow-up. (Id.). His discharge diagnosis also included severe radicular symptoms with left lower extremity pain, right lower extremity numbness; uncontrolled type II diabetes mellitus; and hypertension. (R. 410). Plaintiff ambulated with physical and occupational therapy but not well, so he was given a walker at discharge. (R. 409, 431). Plaintiff also received pain medication and a recommendation for outpatient physical therapy and occupational therapy. (R. 410).

On September 2, 2010, Plaintiff presented to WVUH-East ER reporting pain. (R. 415). Dr. Best performed a musculoskeletal examination, which revealed tenderness to palpation in the low back and bilateral lower extremity muscle atrophy. (Id.). The neurologic examination revealed normal dorsi and plantar flexion of the left lower extremity, a slight decreased ability to plantar flex the right lower extremity, unremarkable dorsiflexion in the right ankle, normal deep tendon reflexes and normal sensation in the lower extremities. (Id.). Plaintiff was ambulatory with the assistance of a walker. (Id.).

On September 3, 2010, Plaintiff presented to WVUH-East ER reporting right first digit swelling and pain. (R. 412). Dr. Best performed a hockey stick incision over the ulnar portion of

the second digit. (Id.). Plaintiff stated "he felt much better already" because the pressure in the area had subsided. (Id.). Plaintiff was given a prescription for Keflex. (Id.).

On September 5, 2010, Plaintiff presented to WVUH-East ER reporting back pain and needing his finger wound rechecked. (R. 406). Dr. Pettrone found no purulent drainage and no warmth surrounding the incision wound. (R. 407). Dr. Pettrone performed a back examination, which revealed diffuse tenderness to palpation throughout the lumbar spine. (Id.). Plaintiff was able to sit up and achieve a ninety degree position while on the gurney with no significant pain. (Id.). When the straight leg maneuver was performed, Plaintiff grimaced in pain. (Id.). Diagnoses included acute exacerbation of chronic low back pain and lumbar radiculopathy. (Id.).

On September 8, 2010, Plaintiff presented to Panhandle Neurology Center, Inc. for a follow-up appointment with Dr. Karoly Varga, M.D. regarding his lower back pain. (R. 440). Plaintiff stated he had a "huge bulging disc with nerve pinching in my lower back." (Id.). Plaintiff walked with a walker, denied leg weakness and just reported "pain." (Id.). The physical exam noted Plaintiff to be in distress due to pain, decreased sensation on both feet, negative tandem walk, antalgic posture and gait, sensitive sciatic notches and positive straight leg raise test on both sides. (Id.). Diagnoses included LS radiculopathy with exacerbation. (R. 442).

On September, 13, 2010, Plaintiff presented to the Shenandoah Community Health Center for a follow up appointment after his hospital stay for a bulging disc and to address his back pain. (R. 745). Plaintiff reported back pain with an onset six months prior; the problem was improving and the pain was described as a shooting, stabbing and throbbing, aggravated by daily activities and little relief. (Id.). His chronic problems were listed as diabetes type II, hypertension and lumbar disc displacement. (Id.). Plaintiff complained of lower back pain radiating to both legs and buttocks with numbness present in the legs and feet. (R. 746). Dr. Haq, M.D. noted that

the physical examination was "limited" due to pain and that Plaintiff was walking with difficulty due to pain and "walks with support." (R. 747). The physical examination noted mild decreased sensory in the right foot. (Id.). His diagnoses included lumbar disc displacement, lumbosacral radiculopathy and spinal stenosis. (R. 748). Dr. Haq further noted that while Plaintiff was in the hospital, Dr. Varga and Dr. Yallamenchelo recommended surgery, which was refused due to insurance. (Id.). Dr. Haq "will refer pt now for surgery ASAP." (Id.). Plaintiff's other diagnoses included hypertension, stable, and diabetes type II, for which Plaintiff had been non-compliant but was currently on medication. (Id.). He was referred to neurosurgery for L-S radiculopathy with spinal stenosis. (Id.).

On September 14, 2010, Plaintiff presented to the WVUH-East ER with his chief complaint noted as intoxication. (R. 400). Plaintiff underwent a CT scan of his head, which showed normal findings. (R. 430). The scan did reveal a small vertex hematoma in the scalp. (Id.). A urine drug screen showed benzodiazepines, cocaine and marijuana as well as an alcohol level of 109. (R. 401). The final diagnosis was alcohol and drug intoxication. (Id.).

On September 16, 2010, Plaintiff visited Panhandle Neurology Center, Inc. again reporting lower back pain. (R. 437). Plaintiff stated, "I'm in terrible pain, I cannot sleep only five minutes here and there!" (Id.). The physical examination noted distress due to pain, decreased sensation in both feet, no tandem walk, antalgic posture and gait, sensitive sciatic notches and positive straight leg raise test on both sides. (Id.). His diagnosis and prescriptions remained unchanged. (R. 439).

On September 27, 2010, Plaintiff presented to the Shenandoah Community Health Center reporting constipation, diabetes, hypertension, and back pain. (R. 750). Plaintiff presented to the

appointment using a walker for ambulation. (Id.). His diagnoses included hypertension, diabetes type II, constipation and lumbar disc displacement. (Id.).

On September 30, 2010, Plaintiff presented to an appointment with Dr. Allan Fergus, M.D. at the Virginia Brain and Spine Center reporting severe lower back pain with bilateral leg pain, numbness and weakness of both feet. (R. 443). Dr. Fergus performed a physical examination finding Plaintiff was suffering from severe back and leg pain. (R. 444). Plaintiff's leg pain was bilateral but worse on the right side; he had decreased range of motion, movements were painful and his right straight leg raise was positive. (Id.). Dr. Fergus also found Plaintiff had ankle weakness with dorsiflexion and plantarflexion. (Id.). Plaintiff's diagnoses included herniated lumbar disc. (Id.). Dr. Fergus asked Plaintiff to return with the MRI from August 21, 2010 to make a final decision regarding surgery. (Id.).

On October 1, 2010, Plaintiff returned to the Virginia Brain and Spine Center with his MRI results. (R. 445). Dr. Fergus determined Plaintiff had a L4-5 herniated pulpous to the right but caused central stenosis. (Id.). Further, Dr. Fergus determined Plaintiff had right L5 radiculopathy including dorsiflexion weakness. (Id.). Dr. Fergus scheduled a right L4-5 posterior hemilaminectomy and discectomy. (Id.).

Plaintiff underwent surgery at Winchester Medical Center. (R. 447). Dr. Fergus removed a yellowed ligament and a very large disk fragment. (R. 466). Plaintiff was not admitted to the hospital, but he went to the AM admits after the surgery and left several hours later. (R. 462). After surgery, he was ambulating with no difficulty. (Id.). The incision was clean, dry, and intact. (Id.). Plaintiff was tolerating his diet and his pain was controlled. (Id.).

On November 10, 2010, Plaintiff made a follow-up visit to Dr. Fergus. (R. 468). Plaintiff's leg pain was gone and he reported "doing great" but he still had pain in both feet.

(Id.). The physical examination noted dorsiflexion weakness that seemed to be unchanged compared to the pre-operation examination. (R. 468). Plaintiff was experiencing numbness in his legs that followed a stocking distribution. (Id.). Dr. Fergus noted the numbness may have been residual parasthesias related to the root compression performed during surgery or may have been related to Plaintiff's diabetes. (Id.). His dianogis was herniated lumbar disc. (Id.).

On November 22, 2010, Plaintiff visited Panhandle Neurology regarding his lower back pain. (R. 482). Plaintiff reported significant improvement in his lower back stating, "I'm almost pain free. I'm happy!" (Id.). Plaintiff still maintained numbness in his right foot up to the middle of his shin. (Id.). Plaintiff still walked with a limp but had no falls. (Id.). The physical exam showed decreased dorsi- and planter flexion, decreased sensation on both feet, greater on the right than left, negative tandem walk due to pain, no antalgic gait but walk with left sided limp. (R. 483-84). Diagnoses included LS radiculopathy and noted good results regarding lower back pain. (R. 484). Dr. Varga was unable to predict how much permanent nerve damage Plaintiff had at the time and noted that Plaintiff was not ready to go back to work. (Id.).

On December 23, 2010, Plaintiff presented to Dr. Fergus for a follow-up visit. (R. 469). Plaintiff continued to report bilateral foot numbness. (Id.). Dr. Fergus noted that Plaintiff's pre-operative pain was gone but he still had parasthesias in his feet. (Id.). Dr. Fergus recommended Plaintiff to have a MRI of his lumbar spine. (Id.).

On January 4, 2011, Plaintiff presented to Dr. Thomas Acree, a podiatrist, for foot pain and numbness bilaterally that existed for two or three months. (R. 1003). The pain was described as constant and sharp. (Id.). The physical exam noted that the muscle strength in both feet was good and the inspection of the bones presented nothing out of the ordinary. (Id.). Plaintiff's

diagnoses were bilateral foot pain as well as uncontrolled diabetes mellitus, type II with neurological manifestations and type II with peripheral circulatory disorders. (Id.).

On February 2, 2011, Plaintiff visited Dr. Varga regarding his lower back pain (R. 498). Plaintiff reported his lower back pain was still improving, but Plaintiff reported excruciating bilateral feet and leg pain. (Id.). Plaintiff noted his pain was a "stabbing feeling" that caused him to stop walking, interferes with his sleep and results in impaired balance. (Id.). The physical examination showed similar findings as his previous visit, including decreased sensation in his feet and walking with a left-sided limp. (R. 500). Dr. Varga ordered nerve conduction studies on both Plaintiff's motor and sensory nerves and an electromyography on his extremities. (R. 500). On February 10, 2011, Dr. Varga performed the EMG and NCV tests. (R. 501). The results were consistent with severe chronic axonal sensorimotor peripheral polyneuropathy and indicated chronic bilateral multilevel LS radiculopathies, which could not be ruled out. (Id.).

On February 7, 2011, Plaintiff returned to Shenandoah Community Health Center complaining of back pain and depression. (R. 754). Plaintiff reported pain radiating to his calves, feet and thighs. (Id.). He described the pain as numbness, piercing, sharp, shooting and stabbing. (Id.). Symptoms were aggravated by bending, changing positions, daily activities, lifting, rolling over in bed, sitting, standing and walking. (Id.). Plaintiff reported that he snorted heroin for pain relief. (Id.). In regard to depression, Plaintiff reported his first episode occurring in 2011 and that it was difficult to meet home, work or social obligations. (Id.). He had contemplated suicide but did not report current suicidal thought and stated that he had gotten rid of his hand gun. (Id.). During the exam, Plaintiff easily moved to the exam table and did not notice when Nurse Sheetz palpated his lumbar spine. (R. 756). Nurse Sheetz noted that after the exam, Plaintiff placed his palms on the exam table and hopped off the table with no difficulty. (Id.). His diagnoses were

diabetes type II, hypertension, lipids, back pain, depression and drug use. (Id.). On February 9, 2011, Plaintiff returned for a follow-up on his laboratory work with Dr. Haq. (R. 758). There labs noted some improvement with his diabetes type II and no change in lipids. (R. 760).

On March 8, 2011, Plaintiff presented to a follow-up appointment with Dr. Haq at the Health Center for his diabetes type II. (R. 762). Plaintiff's physical examination was normal. (R. 763). Plaintiff was counseled on diabetes, including its risks, complications and management. (R. 764). Plaintiff was referred for further diabetic education. (R. 765).

On March 9, 2011, Plaintiff presented to Dr. Varga reporting lower back pain and neuropathy. (R. 503). Plaintiff reported his lower back was starting to hurt a little because he was becoming more active at the time. (Id.). His main issue was excruciating bilateral feet and leg pain. (Id.). The physical exam noted Plaintiff to be frustrated and anxious about his medical conditions, decreased dorsi- and planter flexion, decreased sensation on both feet, negative tandem walk, no antalgic gait but walked with left-sided limp. (R. 505). Diagnoses remained unchanged. (Id.).

On March 14, 2011, Plaintiff had a follow-up appointment with Dr. Haq for his diabetes management. (R. 766-69). Plaintiff reported he was compliant with medication. (R. 766). The review of systems and physical examination were normal. (R. 767-68).

On March 22, 2011, Plaintiff presented to Dr. Varga reporting "three really bad days" of lower back pain with "pain shooting down" on his legs. (R. 506). Plaintiff explained the problem resolved but he still had excruciating feet and leg pain. (Id.). The physical examination showed the same findings as his previous visit and his diagnoses remained unchanged. (R. 508).

On April 26, 2011, Plaintiff returned to an appointment with Dr. Varga reporting his back was "acting up" and he could "hardly sleep." (R. 509). Plaintiff noted the pain was consistent in

his back but was not a "shooting" pain. (Id.).Plaintiff reported the pain in his feet was unchanged stating, "They hurt big time. They are killing me." (Id.). The physical exam noted the same findings as his previous visit and his diagnosis noted "some temporary setback" regarding his lower back pain. (R. 511). Dr. Varga adjusted Plaintiff's pain medications. (Id.).

On June 20, 2011, Plaintiff had an appointment with Dr. Thomas Withuhn at Shenandoah Community Health Center for nausea and vomiting. (R. 770-75). Plaintiff had been unable to eat for the past eight days and had been vomiting intermittently for that time, with blood in his vomit the night before. (Id.). Plaintiff felt dehydrated and had lost eleven pounds; he also reported chronic diarrhea. (Id.). He reported the symptoms started a few months prior with two the three episodes a day. (Id.).The physical examination noted Plaintiff was sleepy and moderately dehydrated, there was diffuse abdominal tenderness; Plaintiff was ambulatory. (R. 773). The diagnoses were abdominal pain and nausea with vomiting; Dr. Withuhn noted that an ulcer or gastritis were most likely culprit. (R. 775). Plaintiff was referred to a gastroenterologist. (Id.).

On June 23, 2011, Plaintiff presented to the WVUH-East Emergency Room. Plaintiff originally presented to Dr. Withuhn on June 20 reporting nausea and vomiting lasting two weeks. (R. 687). After abnormal labs were noted by Dr. Withuhn, Plaintiff was told to report immediately to the ER. (R. 692). Plaintiff was admitted to City Hospital for severe dehydration and acute renal failure. (R. 685). Plaintiff underwent a renal ultrasound, which was normal. (R. 686, 694). Plaintiff was discharged from the hospital on June 24, 2011. (R. 686). His diagnoses at this time included acute renal failure secondary to diabetic nephropathy versus hypertension versus other nephron-toxins; uncontrolled diabetes; diabetic neuropathy; chronic back pain and radiculopathy; history of MRSA boils; history of alcohol and substance abuse. . (Id.).

On June 27, 2011, Plaintiff visited Dr. Varga at Panhandle Neuropathy reporting improved back pain but the pain and numbness in his feet remained unchanged. (R. 530). The physical exam noted decreased flexion, decreased sensation of both feet, negative tandem walk, no antalgic gait but walk with left-sided limp. (R. 532). His diagnoses included lower back pain. (Id.).

On June 28, 2011, Plaintiff had a follow up appointment with Dr. Withuhn at Shenandoah Community Health Center for renal failure and diabetes. (R. 776-80). Plaintiff was recently hospitalized for acute renal failure. (R. 776). Plaintiff reported feeling better however still suffering from brief intermittent nausea. (Id.). Dr. Withuhn noted that Plaintiff's diabetes began in 2007 and was currently stable; he was experiencing dysesthesias and pertinent negatives included blurred vision and chest pain. (Id.). The physical examination was normal. (R. 778-79). His diagnoses included acute renal failure, improved diabetes type II; and hypertension. (R. 779).

Plaintiff visited Dr. Withuhn at Shenandoah Community Health Center on July 11, 2011, complaining of severe gout, located at the left big toe, which was aggravated by sitting, standing, and walking and relieved by resting and applying heat. (R. 781). The physical examination noted edema at the left big toe as well as the left foot hallux joint focally red without distal or proximal redness, very tender to touch and with range of motion. (R. 783). Dr. Withuhn advised Plaintiff to drink plenty of fluids and prescribed three pills of Colcrys to treat gout. (Id.).

Plaintiff presented to an appointment with Dr. Withuhn on July 14, 2011 with severe gout pain. (R. 785). Plaintiff reported some relief with Colcrys but the pain and swelling returned and his left foot was more swollen and painful than before. (Id.). The physical examination noted

Plaintiff in moderate distress due to pain and his left hallux toe joint was bright red and tender with no distal or proximal tenderness. (R. 787). Plaintiff was prescribed Prednisone. (R. 788)

On July 27, 2011, Plaintiff presented to WVUH-East ER reporting a fall, approximately eight to nine feet through the floor of his father's house. (R. 512). Plaintiff reported right buttock pain radiating into the right leg; he also had difficulty standing on the leg secondary to pain. (Id.). Plaintiff underwent a CT scan of the lumbar spine, abdomen, and pelvis and an x-ray of his right ankle. (R. 513). The scan revealed L4-L5 and L5-S1 moderate disk bulges but no acute traumatic injury. (R. 513, 522). The x-ray showed two small nondisplaced fractures of the talus with soft tissue swelling over the medical and lateral aspect. (R. 513, 521). The CT of Plaintiff's abdomen was normal. (R. 520). Plaintiff was given pain medication, placed in a posterior splint, fit with crutches and encouraged to follow-up with Dr. Varga. (R. 513-14). His discharged diagnoses were lumbar disc displacement, fall from building, back pain and ankle fracture, right. (R. 519).

On July 28, 2011, Plaintiff had an appointment with Dr. Withuhn at Shenandoah Community Health Center after he fell nine feet through his father's floor fracturing his right ankle, dislocating three discs in his back, and suffering multiple lacerations and abrasions. (R. 789). Plaintiff complained of severe back pain at an eight out of ten that was worse with prolonged standing or raising his left leg; the pain also radiated down his left leg. (Id.). The pain was better with rest and medication. (Id.). The physical examination noted spinal tenderness, muscle spasms along the spine and left lumbosacral tenderness. (R. 792). Plaintiff's diagnoses included lumbar disc displacement, severe fall from building with back pain and weakness in the left leg, right ankle fracture and muscle weakness. (R. 792-93). Dr. Withuhn ordered an MRI of the spine. (R. 793).

On July 29, 2011, Plaintiff presented to an appointment with Dr. Withuhn complaining of back pain and right ankle pain. (R. 794-97). Plaintiff's diagnosis was ankle fracture. (R. 796). Plaintiff had an appointment with Dr. Varga after the weekend, so additional Oxycodone was not prescribed despite Plaintiff's request. (Id.).

On August 3, 2011, Plaintiff visited Dr. Varga at Panhandle Neurology and reported his recent fall, in which he broke his right ankle. (R. 536). Dr. Varga diagnosed lower back and right ankle pain. (R. 538). Also on this date, Plaintiff underwent a CT scan of his right ankle. (R. 675). The scan revealed comminuted fractures involving the posterior lateral aspect of the talar dome with multiple small fragments in the region. (Id.).

On August 4, 2011, Plaintiff had an appointment at Shenandoah Community Health Center and reported left foot pain that was aching and throbbing at his left big toe with associated symptoms of instability, limping, swelling, tenderness and weakness. (R. 798). He also had a right ankle fracture. (Id.). The physical exam showed no joint deformity or swelling of the left foot; he had full range of motion; and his right foot was swollen at the first metatarsal head. (R. 799-800). Diagnoses included gout and right ankle fracture, awaiting surgery with Dr. Knutson. (R. 801).

On August 24, 2011, Plaintiff presented to an appointment with Dr. Withuhn complaining of left ear pain, diabetes, back and leg pain from his fall, and gout. (R. 802). Dr. Withuhn had ordered an MRI but Medicaid denied the request. (Id.). His pain was highly variable, an average of five out of six but more when he "tweaks," which causes a frequent, sharp and persistent pain. (Id.). The physical examination noted his spine was positive for posterior tenderness, moderate to severe. (R. 805). Plaintiff walked with a limp and his back pain interfered with walking. (Id.). Plaintiff's left foot had improved, however, and he had 5/5

strength. (Id.). Plaintiff's diagnoses included diabetes; lumbar disc displacement, pain back to baseline; gout; and hypertension. (Id.).

On September 12, 2011, Plaintiff presented to WVUH-East Emergency Room reporting nausea, vomiting, diarrhea and dehydration. (R. 649). Plaintiff reported feeling weak with diffuse abdominal pain. (R. 660). The physical examination at this time was normal. (R. 651). Diagnosis at discharge include dehydration with nausea and vomiting. (Id.).

On September 14, 2011, Plaintiff presented to Dr. Withuhn for a follow-up after his ER visit. (R. 807). Plaintiff reported his vomiting had improved and he only felt nauseous "at times." (Id.). Diagnoses were nausea with vomiting, acute renal failure and gout. (R. 809).

On September 22, 2011, Plaintiff followed-up with Dr. Withuhn complaining of severe abdominal pain and severe constipation, aggravated by anxiety. (R. 811). The exam noted abdominal tenderness, mild guarding, and a dysthymic affect. (R. 814). Diagnoses included abdominal pain, for which Dr. Withuhn ordered a CT scan of the abdomen; and hypertension, but medications were not increased because Plaintiff felt dizzy and weak. (Id.).

Also on September 22, 2011, Plaintiff presented to an appointment with Dr. Varga where he reported involvement in a car accident on September 10, 2011. (R. 539). Plaintiff stated he had no immediate issues, but two or three days after the accident, he began to experience shooting pain in his right leg, as he had experienced previously, and a new, similar, sharp shooting pain in his left leg. (Id.).Plaintiff also reported severe constipation, frequent muscle spasms, dizziness, fatigue, and continued neuropathy in his foot. (Id.). The physical examination noted decreased flexion, decreased sensation of both feet, negative tandem walk due to pain, antalgic gait, walk with left-sided limp, positive straight leg raise test on both sides and spastic painful LS paraspinal muscles. (R. 541). Diagnoses included lower back and right ankle pain,

right ankle fracture, LS radiculopathy, lower back symptoms with new injury and pain exacerbation. (Id.). Dr. Varga prescribed a temporary dose of Oxycodone and considered ordering a LS MRI. (Id.).

On October 17, 2011, Dr. Withuhn ordered a CT scan of Plaintiff's abdomen and pelvis. (R. 648). The scan revealed a contracted gallbladder but showed no mass lesion. (Id.).

Plaintiff returned to Shenandoah Community Health Center on October 13, 2011 due to an elevated blood sugar and right foot pain. (R. 816). Plaintiff reported no back pain, myalgia and weakness. (R. 818). The physical exam noted swelling, moderate pain with motion in the right foot with edema on the right ankle, pitting with a severity estimation of 2+; left foot had no swelling and full range of motion. (R. 819). Diagnoses included diabetes type II and gout. (Id.).

On October 26, 2011, Plaintiff presented to an appointment with Dr. Michael Rezaian, a rheumatologist, for an evaluation of gout. (R. 1039). Plaintiff reported pain in his lower extremities and lower to mid-back, which he described as aching, burning, deep, disabling, constant, severe and excruciating. (Id.). He reported pain improved with heat, hot baths and medications and was aggravated by activity, exercise, weather changes and repetitive activity. (Id.). As for ambulation, Plaintiff reported using a cane and a walker to help with walking and stability. (R. 1040). The physical examination noted left ankle tenderness with swelling as well as localized side tenderness, with limited plantar flexion, limited dorsiflexion and overall limited inversion and eversion. (R. 1041). Plaintiff also had left tenderness, swelling and limited range of motion of his metatarsophalangeal joints (MTPs). (Id.). His diagnoses included gouty arthritis; ankle joint swelling; foot joint swelling; tenosynovitis; limited supply of Colcrys due to insurance; recurrent attacks and family history of gout. (Id.). Dr. Rezaian prescribed additional medications. (R. 1042).

On November 2, 2011, Plaintiff visited Dr. Varga reporting his lower back pain was "doing the same" but he was "used to it." (R. 542). Plaintiff's major issue was gout exacerbation. (Id.). The physical exam showed decreased flexion, decreased sensation of both feet, negative tandem walk, antalgic gait, walk with left-sided limp, positive straight leg raise test on both sides, spastic and painful LS paraspinal muscles, and swollen, reddish, inflamed toes. (R. 544). Diagnoses remained unchanged and Dr. Varga noted the major issue as a gout flare-up. (Id.).

On November 8, 2011, Plaintiff returned to Dr. Rezaian with a chief complaint of right ankle pain as well as pain in his neck, middle and lower back, left shoulder, right knee, right ankle, foot and heel and left heel. (R. 1044). Plaintiff also reported diarrhea, morning stiffness, stiffness with sitting and inactivity, difficulty sleeping and more pain and stiffness with weather changes. (Id.). The physical exam noted tenderness on both shoulders with good range of motion; tenderness of hips with limited range of motion; tenderness and 1+ swelling on both knees with limited range of motion; tenderness and 1+ swelling of both ankles with limited range of motion; and tenderness and 1+ swelling with limited range of motion of MTPs. (R. 1045). Active problems included ankle joint and MTP joint swelling, worse than before, with diagnoses of gouty arthropathy, unspecified, and effusion of ankle and foot joint. (Id.).

Also on November 8, 2011, Plaintiff returned to Shenandoah Community Health Center with elevated blood sugar. (R. 821). Dr. Yellott noted swelling in Plaintiff's right ankle and that Plaintiff appeared anxious. (R. 823). Plaintiff's diagnoses were gout and diabetes type II for which Dr. Yellot advised Plaintiff to keep notebooking his blood sugar results. (Id.).

At a follow-up appointment with Dr. Withuhn on November 17, 2011, Plaintiff said his abdominal pain was not getting any better and pain medications did not help with the pain. (R. 825). The physical exam was unremarkable. (R. 828). Diagnoses included abdominal pain,

severe and persistent; diabetes type II, sugars doing well; nausea with vomiting, likely gastroparesis; and hypertension, stable. (Id.). Dr. Withuhn suspected the abdominal pain was caused by a gallbladder dysfunction or gastroparesis. (Id.).

On November 30, 2011, Plaintiff underwent an evaluation by Dr. Acree, a podiatrist, at Raleigh Street Podiatry because of ankle pain, exacerbated by walking and other weight bearing activities. (R. 1001). The physical examination showed an antalgic gait, pain on palpation of the ankles, an abnormal deformity of the left ankle joint, tenderness of the Achilles tendon and decreased range of motion. (Id.). Sensation was decreased to absent but overall intact to light touch and vibration. (R. 1002). Diagnoses included onychomycosis, peripheral neuropathy, gout, degenerative joint disease/osteoarthritis of the ankle/foot and peripheral vascular disease. (Id.).

On December 8, 2011, Plaintiff returned to Dr. Acree at Raleigh Street Podiatry for ankle pain, exacerbated by weight bearing and ankle motion. (R. 999). Plaintiff stated that the ankle pain began in September 2011. (Id.). Review of systems noted stiffness, bone pain and joint complaints as well as pain and paresthesia. (Id.). The physical exam noted an antalgic gait, pain on palpation of the ankles and 5/5 bilateral lower extremity strength. (Id.). The right lower extremity showed tenderness at the Achilles tendon insertion and tendon substance; there was decreased dorsiflexion, plantar flexion and inversion and eversion of the right ankle. (Id.). Dr. Acree's diagnoses included diabetes mellitus, type II with circulatory manifest; peripheral neuropathy, idiopathic; gout; and degenerative joint disease/osteoarthritis, ankle/foot, primary localized. (R. 1000). Dr. Acree ordered a new boot for Plaintiff's foot and prescribed medication. (Id.). Plaintiff had a follow-up on December 22, 2011 but failed to attend. (Id.).

Also on December 8, 2011, Plaintiff had a follow up appointment with Dr. Withuhn regarding his abdominal pain and diabetes. (R. 831). Plaintiff reported constipation and

exacerbated abdominal pain. (Id.). He was not able to eat as he constantly felt full. (Id.). The physical exam showed abdominal tenderness in the epigastric, with no guarding or rebound. (R. 834). Diagnoses included abdominal pain and diabetes type II. (Id.). Dr. Withuhn scheduled abdominal imaging and gastric evaluations. (Id.).

On December 9, 2011, Plaintiff presented to Winchester Medical Center for his gastric emptying evaluation with Dr. Withuhn. (R. 730). The impression was markedly delayed gastric emptying of solids, with only minimal gastric emptying over two hours; no gastroesophageal reflux was identified. (Id.).

On December 20, 2011, Plaintiff underwent a gallbladder ejection evaluation at Winchester Medical Center with Dr. Withuhn. (R. 731). The evaluation found normal gallbladder function and a normal image of the liver, gallbladder, and bile ducts. (R. 732). Dr. Withuhn also conducted an abdominal ultrasound, which identified three gallbladder polyps, the largest measuring 1.2 cm. (R. 733). The ultrasound also showed mild fatty infiltration of the liver and mild splenomegaly. (Id.).

On December 21, 2011, Plaintiff visited Dr. Varga regarding his lower back pain and neuropathy. (R. 546). Dr. Varga found Plaintiff to be noncompliant with his pain contract due to testing positive for cocaine and THC. (Id.). Dr. Varga noted new findings of severe gastroparesis, for which he was seeing an endocrinologist. (Id.). The limitations assessed during his physical examination remained unchanged from his prior visit. (R. 548). Diagnoses included lower back and right ankle pain, right ankle fracture (healed), gastroparesis and LS radiculopathy. (Id.). At this time, Plaintiff was discontinued from pain management. (Id.).

On December 29, 2011, Plaintiff had a follow-up appointment with Dr. Withuhn. (R. 838). Plaintiff reported cold symptoms, insomnia and gastroparesis. (R. 839). He had less acid

reflux symptoms but was still experiencing stomach cramps. (Id.). The physical exam noted his abdomen was nontender, which was "very different from normal (he is usually chronically tender). (R. 842). Diagnoses included hypertension; gastroparesis; insomnia; and upper respiratory infection. (Id.).

On January 5, 2012, Plaintiff presented to Dr. Acree at Raleigh Street Podiatry reporting pain in his right thigh and right ankle. (R. 996). The pain moderately limited his activity and he experienced no pain when resting. (Id.). The physical examination noted an antalgic gait, pain on palpation of the ankles, no tenderness of the Achilles tendon on the left but tenderness on the right as well as decreased range of motion of the right ankle. (Id.). Diagnoses remained unchanged since the last visit. (R. 997).

On January 10, 2012, Plaintiff underwent a laparoscopic cholecystectomy at City Hospital following his recurrent epigastric abdominal discomfort and confirmation of gallbladder polyps. (R. 633). The biliary tract revealed gallbladder polyps in the neck of Plaintiff's gallbladder. (R. 635). Dr. Carrier removed the gallbladder for pathologic evaluation. (Id.). The surgical pathology report revealed Plaintiff had chronic cholecystitis and cholelithiasis. (R. 638).

On January 19, 2012, Plaintiff followed up with Dr. Acree at Raleigh Street Podiatry reporting constant pain in his right ankle that moderately limited his activity and no alleviating factors. (R. 994). The physical examination showed tenderness at the Achilles tendon of the right rear foot and decreased range of motion of the right ankle. (Id.). Diagnoses remained unchanged from the previous visit. (Id.). Dr. Acree advised Plaintiff to discontinue use of Lyrica and Cymbalta as the medications were not alieving his pain. (R. 994-95). Dr. Acree ordered diabetic shoes and inserts for Plaintiff. (R. 995). On February 20, 2012, a message was left for Plaintiff to

call Raleigh Street Podiatry about the shoes that were ordered. (Id.). Further, a call was placed to Plaintiff on May 7, 2012 but his number was disconnected. (Id.).

On January 20, 2012, Plaintiff had an appointment with Dr. Withuhn and reported pain in the right lower quadrant of his abdomen, worse at night. (R. 844). He also reported his gastroparesis was becoming worse. (Id.). The physical examination noted abdominal tenderness with no distension, guarding or rebound. (R. 846). The diagnosis was abdominal pain, to be followed clinically because very similar to gastroparesis pains. (Id.).

On January 27, 2012, Plaintiff was admitted to City Hospital reporting nausea and vomiting, two weeks after his gallbladder surgery. (R. 611). Plaintiff underwent a HIDA Scan and a CT scan of his abdomen and pelvis. (Id.). The HIDA scan did not reveal a leak. (R. 607). The CT scan revealed a small amount of fluid seen on the surgical site (gallbladder bed) with no other acute abnormalities. (Id.). To drain the fluid, Plaintiff underwent percutaneous drainage which revealed mainly old blood. (R. 607). Cultures from the procedure were negative. (Id.). Plaintiff was discharged on January 29, 2012. (R. 607-08). His discharged diagnoses included right upper quadrant pain, question related to seroma, and a history of diabetes, gastroesophageal reflux, gastroparesis and acute renal failure. (R. 607).

On February 27, 2012, Plaintiff presented to WVUH-East Emergency Room reporting nausea, vomiting, diarrhea, and chest pain. (R. 589). Plaintiff reported fevers, chills, an occasional bloody taste in his mouth, and left anterior chest pain for the last three days. (Id.). He reported having several episodes of vomiting and loose bowel movements more than four times per day. (R. 586). Plaintiff underwent an electrocardiogram, a chest x-ray, and a urine test. (R. 590). The electrocardiogram and chest x-ray were normal, but the urine test was positive for cocaine, marijuana, and tricyclic antidepressants. (Id.). Plaintiff was admitted to the hospital.

(Id.). His diagnoses included intractable nausea and vomiting, likely secondary to gastroparesis; diarrhea, rule out infectious etiology; diabetes mellitus; hypertension, uncontrolled; hyperlipidemia; history of recent cholecystectomy with post-operative complications of seroma at the surgical site; and evidence of polysubstance abuse. (R. 587-88). On February 28, 2012, against medical advice, Plaintiff discharged himself from the hospital without being seen by any doctors. (R. 583).

On March 20, 2012, Plaintiff had an appointment at Shenandoah Community Health Center. (R. 848). Plaintiff reported continued neuropathy with a pulling pain in his upper thigh. (Id.). He also reported that his gout was slowly improving. (Id.). The review of systems noted fatigue, vision loss, constipation, diarrhea, sleep disturbance, back pain and myalgia. (R. 851). The physical exam showed swelling in both feet. (R. 852). Diagnoses included chronic neuropathy, diabetes; and gout. (Id.).

On March 21, 2012, Plaintiff presented to WVUH-East Emergency Room reporting leg pain in the back of his left leg, primarily behind the knee. (R. 578). The physical examination noted tenderness throughout the popliteal fossa on the left side as well as the distal half of the posterior aspect of his upper leg; there was no swelling. (R. 579). Plaintiff underwent a venous Doppler ultrasound of the left lower extremity. (R. 579-80). The ultrasound was normal and showed no evidence of deep vein thrombosis. (Id.). The diagnosis was left leg pain of unclear etiology. (R. 579). Plaintiff was advised to arrange a follow-up evaluation with Dr. Withuhn and return if new or worsening symptoms developed. (Id.).

On March 24, 2012, Plaintiff presented to WVUH-East Emergency Room reporting left leg pain and spasms, including pain while walking and when touching his leg. (R. 575). The physical examination noted tenderness along the lateral aspect of the left calf, the popliteal area,

the distal lateral aspect of the thigh. (R. 576). The exam further noted "he has obvious muscle spasms and has pain on palpation. (Id.). Diagnoses included muscle spasms with muscle tenderness into the left leg. (Id.). Dr. Ramsay prescribed Plaintiff Robaxin, a muscle relaxer, and placed Plaintiff on crutches. (Id.). Plaintiff was advised to return to the ER if symptoms worsened. (Id.).

On April 19, 2012, Plaintiff presented to an appointment with Dr. Withuhn reporting muscle pain that began a month prior to the visit; the pain was burning and associated symptoms included decreased mobility, night-time awakening and weakness. (R. 854). Plaintiff explained he had a torn calf muscle in his right leg. (Id.). As for diabetes, the problem was stable and pertinent negatives included blurred vision and foot ulcers. (Id.). The physical examination noted his left calf had some moderate tenderness and minor swelling behind the knee. (R. 856). Diagnoses included: hypertension, stable; lipids; diabetes type II; and neuropathy in diabetes. (Id.).

On May 9, 2012, Plaintiff had an appointment with Dr. Withuhn regarding chest pain and diabetes. (R. 859). Plaintiff reported that he experienced pain in his upper left chest every day for the past two weeks which worsens at night however, the pain decreases when pressure is applied to his chest wall. (Id.). Further, Plaintiff reported that his blurry vision had been worsening but he has an appointment to see an ophthalmologist on May 14, 2012. (Id.). The review of systems was positive for fatigue and dyspnea. (R. 861). The physical examination was normal. (Id.). Dr. Withuhn suspected Plaintiff's chest pain to be more gastrointestinal, however, due to Plaintiff's high blood pressure, he recommended a stress test. (R. 863).

On May 23, 2012, Plaintiff underwent a Lexiscan Stress Test at City Hospital for chest pain. (R. 562). Dr. Withuhn reported Plaintiff experienced no significant symptoms. (Id.).

On June 22, 2012, Plaintiff had a follow-up appointment with Dr. Withuhn regarding his diabetic neuropathy. (R. 865). Plaintiff reported neuropathy in his legs and pain in his back due to the disc bulge and severe spinal stenosis. (Id.). Further, Plaintiff noted that his vision was worsening and he began seeing Dr. Ilyas for eye injections. (Id.). The review of systems and physical examination were largely normal, but did note fatigue and "no foot drop." (R. 867). Diagnoses remained unchanged and Dr. Withuhn refilled Plaintiff's prescriptions. (Id.).

On July 17, 2012, Plaintiff returned for a follow-up appointment with Dr. Withuhn. (R. 870). Plaintiff reported a pain at an eight out of ten, decreasing to a six out of ten with medication. (Id.). Plaintiff stated he is out of pain medication and requested refills. (Id.). Plaintiff reported medication allows him to bend and lift more and makes his life more manageable. (Id.). Plaintiff also stated that he tried to walk twice daily for short distances as much as pain allows; usually for about ten to fifteen minutes. (Id.). Plaintiff also reported difficulty sleeping despite medications. (Id.). Review of systems was positive for fatigue and back pain. (R. 872). The physical examination noted Plaintiff's spine was positive for posterior tenderness but had normal flexion, extension and lateral flexion and the straight leg raise was negative. (R. 872-73). Plaintiff's diagnoses were neuropathy in diabetes and insomnia. (Id.).

On August 1, 2012, Plaintiff visited Dr. Varga at Panhandle Neuropathy regarding his lower back pain and neuropathy. (R. 549). Plaintiff reported he was constantly experiencing pain in his lower back and sometimes experiencing excruciating pain in his legs and feet. (Id.). Plaintiff reported receiving Oxycodone from Dr. Withuhn but noted it was not enough to manage his pain. (Id.). The physical examination showed decreased dorsi- and plantar flexion, decreased sensation on both feet, antalgic gait, walk with a left-sided limp, positive straight leg raise on both sides, spastic and painful LS paraspinal muscles and swollen, reddish and inflamed toes. (R.

551). Diagnoses included lower back and right ankle pain, gastroparesis and LS radiculopathy. (Id.). Dr. Vargas agreed to reinstate pain management. (Id.).

On August 15, 2012, Plaintiff had a follow-up visit with Dr. Withuhn regarding diarrhea and chronic back pain. (R. 875). Plaintiff reported an increase in abdominal spasms and constipation even though Plaintiff is careful with his diet. (Id.). Plaintiff reported back pain at an eight out ten but a four out of ten with medication; worse with prolonged standing or walking. (Id.). The review of systems was positive for fatigue and Dr. Withuhn noted that Plaintiff looked "better" than his last visit: he lost weight, looked stronger in his legs and arms. (R. 877). Diagnoses included diarrhea, moderate and persistent; lumbar disc displacement, stable with inquiry into pool therapy option; and neuropathy in diabetes. (R. 878).

On September 12, 2012, Plaintiff had a follow-up visit with Dr. Withuhn complaining of ear discomfort, gastropaeresis, chronic pain, and diabetes. (R. 880). The review of systems was positive for abdominal pain during bowel movements and constipation. (R. 881-82). The physical examination was normal except for an abnormal monofilament exam of the extremities. (R. 882-83). Plaintiff's diagnoses remained unchanged and medications were refilled. (Id.).

On October 2, 2012, Plaintiff had an appointment with Dr. Withuhn to complete medical assessment ability paperwork and to address his back pain/spinal stenosis. (R. 885). Plaintiff reported chronic daily back pain, severe with pain at a ten out of ten, aggravated by bending, prolonged sitting, standing, repetitive motion and lifting anything heavy. (Id.). Plaintiff stated the pain was "better" with medication but "in general is fairly intractable." (Id.). Plaintiff's review of systems was positive for fatigue and the physical examination noted Plaintiff's spine was positive for posterior tenderness, 3+ positive straight leg raise on the left and 1-2+ on the right; he also had to shift position and extend his legs due to back pain; he had no foot drop, grip

strength 5/5 and stocking paresthesias. (R. 887-88). Plaintiff's diagnoses included lumbar disc displacement with his main limitations being his legs and back with postural limitations in bending, prolonging sitting and standing for any length of time more than fifteen minutes, such postural movements result in increased severe pain; this "limits his competitiveness in a work environment." (R. 888). Plaintiff was also diagnosed with chronic pain syndrome, for which he is prescribed medication, applies heat/ice and performs gentle stretches. (Id.).

On October 5, 2012, Plaintiff presented to the Rural Outreach Arthritis Center upon referral from his family physician. (R. 1019). Plaintiff reported pain, stiffness, swelling and overall feeling worse since his last visit. (R. 1020). He stated the pain gets worse by the end of the day and at night, he has morning stiffness, difficulty getting and staying asleep and changes in weather making the pain worse. (Id.). He does not exercise regularly and has difficult with routine activities of daily living. (Id.). The physical examination noted normal station but slow painful gait; Plaintiff used a cane and had difficult with ambulation; muscle tone was reduced; he had tenderness and decrease range of motion in his right wrist; he had tenderness and swelling with decreased range of motion in his right ankle as well as tenderness and swelling of the first MTP. (R. 1021). Plaintiff's diagnoses included gouty arthritis, worse without medication; ankle and foot swelling; arthralgia, painful joints without swelling "likely due to an inflammatory process;" and generalized stiffness, with both rest and prolonged inactivity. (R. 1019).

On October 31, 2012, Plaintiff returned to the Rural Outreach Arthritis Center for a follow-up appointment. (R. 1023). Plaintiff rated his pain an eight out of ten and classified the pain as aching, deep, disabling, severe and excruciating; he noted medications and muscle relaxants helps improve the pain. (R. 1025). Plaintiff's diagnoses remained unchanged but also included restless leg syndrome, depression and anxiety, hypertension, peptic ulcer disease and/or

reflux, hyperlipidemia. (R. 1023). Weight loss and exercises for pain and conditioning were also recommended. (R. 1024).

On November 9, 2012, Plaintiff had follow-up with Dr. Withuhn regarding his diabetes and chronic pain syndrome. (R. 963). Plaintiff noted he was recently told by Dr. Knutsen that his frozen shoulder was caused by his diabetes. (Id.). Plaintiff reported increase left shoulder pain three weeks prior with pain in the anterior shoulder at the AC joint "ripping, burning" worse with lifting and better with pain medication. (Id.). The physical exam noted increased tenderness to the left shoulder as well as increase severe pain with lifting shoulder, no left anterior descending (LAD). (R. 964). Plaintiff's diagnoses included frozen shoulder syndrome, treated recently with cortisone injection by Ortho, recommended gently stretches and medication. (Id.). Dr. Withuhn recommended he make an appointment with a diabetes specialist about his frozen shoulder. (Id.).

On November 15, 2012, Plaintiff visited Panhandle Neurology Center, Inc. for a follow-up visit regarding his lower back pain, LS radiculopathy and neuropathy. (R. 1056). Plaintiff reported bilateral feet and leg pain that is excruciating at times, without medication, and with medication, "remains functional." (Id.). Plaintiff's functional capacity evaluation noted impaired balance and Plaintiff stated he uses a cane on bad days. (Id.). During the physical exam, Dr. Varga noted decreased dorsi- planter- flexion; decreased sensation on both feet; Plaintiff was unable to do a tandem walk due to pain; his gait was antalgic and he walked with a left sided limp; he had a positive straight leg test on both sides; spastic painful LS paraspinal muscles. (R. 1058). Diagnoses included lower back pain, right ankle fracture (healed), gastroparesis, LS radiculopathy. (Id.).

On November 19, 2012, Plaintiff presented to Shenandoah Community Health Center with diarrhea, three to five episodes a day. (R. 974). The physical examination noted no edema

present and was otherwise normal. (R. 975). Diagnosis was diarrhea. (Id.). Plaintiff's chronic medical problems at this time were listed as neuropathy in diabetes; exudative retinopathy; chronic pain syndrome; diabetes mellitus type II; hypertension; lumbar disc displacement; gout; gastroparesis; and mixed hyperlipidemia. (R. 974).

On November 29, 2012, Plaintiff visited Rural Outreach Arthritis Center for a follow-up appointment. (R. 1027). The joint swelling has decreased since Plaintiff's last visit. (Id.). Plaintiff continued to report severe pain but noted that he had "not had a flare up." (R. 1028). The physical exam noted normal gait and station as well as residual swelling in the ankles. (R. 1029). His diagnoses remained unchanged and suggested follow-up was six months. (R. 1027).

On November 30, 2012, Plaintiff presented to WVUH – East for an evaluation of his uncontrolled type II diabetes with multiple complications after being referred by Dr. Withuhn. (R. 1076). The review of systems was positive for diarrhea, constipation and joint pain. (Id.). The physical exam noted no edema or tenderness and normal range of motion for his musculoskeletal exam. (R. 1078). Dr. Sheila Ramirez Rodriguez diagnosed Plaintiff with type II diabetes mellitus, uncontrolled. (R. 1079).

On December 14, 2012, Plaintiff returned to Rural Outreach Arthritis with a swollen left foot. (R. 1031-32). Review of systems noted dizziness, blurred vision, dry mouth, shortness of breath, pain in the legs/calves with walking, abdominal pain, diarrhea, constipation, bloating, and numbness and weakness. (R. 1033). The physical exam showed normal station but slow painful gait; tenderness and swelling of the left first MTP as well as the left ankle along with limited range of motion. (Id.). His diagnoses remained unchanged. (R. 1031).

On December 19, 2012, Plaintiff returned to Panhandle Neurology Center for a follow-up visit regarding his lower back pain and neuropathy. (R. 1062). Dr. Varga noted lower back pain,

LS radiculopathy and feet numbness, manageable with medication; recent gout flare-up with terrible pain. (Id.). Plaintiff had been compliant with medication. (Id.). During the physical examination, Dr. Varga noted decreased dorsi- and planter flexion, decreased sensation on both feet, antalgic gait with left sided limp, unable to do tandem walk, positive straight leg raise test on both sides, spastic and painful LS paraspinal muscles and very painful foot. (R. 1064). Diagnoses remained unchanged. (Id.).

On December 26, 2012, Plaintiff presented to Dr. Withuhn for a cough and abdominal discomfort rated at a ten and described as a burning sensation. (R. 977). Plaintiff also reported diarrhea and vomiting but he had not vomited thirty-six hours prior to the visit. (Id.). The review of systems noted fever, cough, sputum, rhinorrhea, abdominal pain, bloating, decreased appetite, heartburn nausea, vomiting, weight loss. (R. 978). The physical examination noted hyperactive bowel sounds, abdominal tenderness and trace LLQ guarding. (R. 979). Dr. Withuhn suspected the stomach flu to be the cause of the abdominal discomfort. (Id.).

On December 31, 2012, Plaintiff returned to Rural Outreach Arthritis Center reporting pain, stiffness and swelling in his ankles and feet, worsened since his last appointment. (R. 1035-36). The review of systems noted weight loss, dizziness, headaches, blurred vision, ringing in the ears, sore throat, shortness of breath, pain in the legs/calves with walking, changes in appetite, abdominal pain, diarrhea, constipation, bloating and numbness and weakness. (R. 1037). The physical examination noted trace edema in the lower extremities; normal station but painful slow gait; bilateral tenderness and fullness with limited range of motion in both ankles and tenderness and fullness of the right first MTP. (R. 1037-38). His diagnoses were updated to include polyarthritis, cause not clear, as well as irritable bowel syndrome. (R. 1035).

On January, 7, 2013, Plaintiff presented to Dr. Withuhn complaining of abdominal discomfort lasting seventeen days. (R. 981). Plaintiff was still vomiting bile and has persistent diarrhea. (Id.). Dr. Withuhn noted tenderness in Plaintiff's abdomen and recommended stool samples to be checked for colitis and advised Plaintiff to continue taking medication. (Id.).

On January 16, 2013, Plaintiff returned to Dr. Withuhn with continued vomiting and abdominal pain. (R. 985). Plaintiff reported feeling constipated, dizzy and weak but he has been able to keep a small amount of food down. (Id.). The physical exam noted abdominal tenderness with trace guarding. (R. 986). Dr. Withuhn conducted an abdominal ultrasound, which was normal. (Id.). Plaintiff's diagnoses were abdominal pain, improving, and gout. (Id.).

On February 19, 2013, Plaintiff returned to Panhandle Neurology. (R. 1065). As for Plaintiff's lower back pain, LS radiculopathy and feet numbness, Plaintiff reported being off all pain medications and experiencing significant withdrawal symptoms but improving. (Id.). He reported his GI symptoms improved. (Id.). The physical examination noted no major changes or improvements since his last visit. (R. 1067). Dr. Varga recommended ANodyn treatment and ordered a physical therapy consultation. (Id.).

### 3. Eye Appointments

On May 22, 2012, Plaintiff presented for an appointment with Dr. Waqas Ilyas, MD, at Retina and Vitreous Consultants, at the request of Dr. Brack, for a consultation regarding background diabetic retinopathy. (R. 1009). He reported one incident of diplopia, or double vision, occasional blurred vision, some difficult reading, improved vision with prescription glasses and noted seeing "stars" after sneezing. (Id.). Dr. Ilyas diagnosed Plaintiff with diabetic macular edema, non-proliferative diabetic retinopathy, and diabetic cataract. (R. 1010). Dr. Ilyas recommended eye surgery and Avastin injections. (Id.).

On July 20, 2012 and July 31, 2012 (R. 1007), Plaintiff had a follow-up appointments with Dr. Ilyas. (R. 1004). Dr. Ilyas subsequently diagnosed Plaintiff with a vitreous hemorrhage in his right eye. (R. 1004). On August 2, 2012, Plaintiff was admitted to the Winchester Medical Center for his right eye surgery with Dr. Ilyas. (R. 735). The vitrectomy was categorized as uneventful and Dr. Ilyas reported Plaintiff did well during and after the surgery. (R. 737). Plaintiff's pre- and post-operative diagnoses were non-clearing vitreous hemorrhage, right eye; and proliferative diabetic retinopathy, right eye. (Id.). Plaintiff was Plaintiff was released the same day, instructed to keep on the eye patch and follow-up the next day. (R. 737).

On August 3, 2012, had a follow-up appointment after his eye surgery. (R. 1011). Plaintiff reported sharp pains in his right eye. (Id.). On August 10, 2012, Plaintiff had a one week follow-up and reported improved vision but that a black spot still exists in his right eye. (R. 1013). Dr. Ilyas removed three sutures from Plaintiff's right eye and applied eye drops. (R. 1014). Dr. Ilyas noted improved vision. (Id.). On September 14, 2012, Plaintiff returned for a post-op appointment and reported that his vision had improved since his last exam. (R. 1015). Dr. Ilyas noted that Plaintiff was doing very well and he wanted to see him again in three month for a return appointment. (R. 1016). On December 18, 2012, Plaintiff had his three month follow-up appointment and reported no change in his vision since the last visit. (R. 1017). Plaintiff reported occasional dryness, no eye pain, stable vision, no new difficulties and blurred vision on waking. (Id.). Diagnoses included proliferative diabetic retinopathy, nuclear sclerosis and very mild cataracts. (Id.). Dr. Ilyas prescribed additional medications and eye drops. (Id.).

On January 21, 2013, Plaintiff visited Dr. Brack for an eye exam. (R. 969). Dr. Brack noted that Plaintiff desired new glasses and had experienced extreme difficulty driving because of double vision, headaches, and floaters. (R. 971). Plaintiff's diagnoses included refractive

error, background diabetic retinopathy, cataracts and hypersensitive retinopathy. (R. 972). Plaintiff received a prescription for new glasses and a referral to a vitreoretinal specialist. (Id.).

### 4. Mental Health Treatment

On March 1, 2012, Plaintiff was seen by Dr. Garcia Merino at West Virginia University Hospital – East. (R. 552-55). Plaintiff presented with depression and an unstable mood. (R. 552). He was showing severe symptoms of depression and not responding to medication well, Plaintiff was prescribed Cymbalta, Seroquel and Neurontin. (R. 555). Plaintiff's diagnoses included: major depressive disorder, recurrent and moderate, and ADHD, by history.

Plaintiff had appointments with Dr. Merino on: May 10, 2012 (R. 556); August 16, 2012 (R. 558); August 30, 2012 (R. 560); August 30, 2012 (R. 1069); September 26, 2012 (R. 1070); October 10, 2012 (R. 1072); November 12, 2012 (R. 1074); December 11, 2012 (R. 1080); and February 11, 2013 (R. 1082). During these visits, Plaintiff presented with an unstable mood, depression, anxiety, hyperactivity and at times racing thoughts, mood swings and insomnia. Plaintiff received supportive psychotherapy, discussed coping skills, and Dr. Merino continued to prescribe and adjust Plaintiff's medications for depression and ADHD. By his November 2012 visit, Plaintiff reported doing much better and that his friends and family have noticed a significant change. (R. 1074).

### 5. New Medical Evidence Submitted to the Appeals Council

The Appeals Council considered and incorporated into the record medical records from University Healthcare dated January 12, 2013 (Exhibit 28F). (R. 5). On January 12, 2013, Dr. Withuhn ordered an abdominal ultrasound of Plaintiff due to reports of diffuse abdominal pain. (R. 1085). The results showed the liver to be grossly normal, status post-cholecystectomy. (Id.).

### 6. Medical Reports/Opinions

### a. Rabah Boukhemis, M.D., November 3, 2010

On November 3, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment conducted by Dr. Rabah Boukhemis, a State Agency medical consultant. (R. 449-56). Under the exertional limitations section of the assessment, Plaintiff reportedly was able to occasionally lift and/or carry (including upward pulling) 20 pounds, to frequently lift and/or carry (including upward pulling) 10 pounds, to stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday, to sit (with normal breaks) for about 6 hours in an 8-hour workday, and to push and/or pull (including operation of hand and/or foot controls) an unlimited amount, other than as shown for lift and/or carry. (R. 450). Under the postural limitations section of the assessment, Plaintiff was able to frequently balance, stoop, and kneel. (R. 451). Further, Plaintiff was able to occasionally climb ramps, climb stairs, and crouch. (Id.). However, Plaintiff was never able to climb ladders, ropes, scaffolds, or crawl. (Id.). Under the environmental limitations section of the assessment, Plaintiff was able to maintain unlimited exposure to extreme heat and noise. (R. 453). However, Plaintiff was to avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and fumes. (Id.). Further, Plaintiff was to avoid even moderate exposure to hazards including machinery and heights. (Id.). There were no manipulative, visual, or communicative limitations established. (R. 452-53). Plaintiff's primary diagnosis was Degenerative Disc Disease in the Lumbar Spine (R. 449). Plaintiff's secondary diagnosis was radiculopathy. (Id.).

### b. Todd Anderson, O.T., January 6, 2011

On January 6, 2011, Plaintiff underwent a WorkWell Functional Capacity Evaluation by Todd Anderson at City Hospital - West Virginia University. (R. 486). Plaintiff reported discomfort in the back of his legs, which caused limitations in walking, sitting, and squatting.

(Id.). Mr. Anderson noted that the objective signs coincided with Plaintiff's reports of discomfort. (Id.). Plaintiff's quality of movement was smooth and coordinated but when walking he was slow especially the longer he walked. (Id.). The evaluation revealed good strength in his upper and lower extremities, except for the right lower extremities. (Id.). He had "excellent mobility" and "back pain is only a minor concern in this client's case." (Id.). As for limitations, Plaintiff's balance was impaired especially when his vision was occluded, which was consistent with sensory disturbance in the feet. (Id.). Plaintiff "struggles with walking, squatting and lifting is limited." (Id.).

The FCE Test Results and Interpretation, noted Plaintiff could rarely lift thirty to forty pounds, occasionally lift twenty to thirty-five pounds and frequently lift ten pounds and frequently "front carry" thirty pounds. (R. 488). Dr. Anderson noted that Plaintiff was short of breath when lifting and had difficulty maintaining balance with max weight when front carrying; he also moved more slowly and carefully and balanced weight on the front of his body. (Id.). As for posture, flexibility and ambulation, Dr. Anderson found occasional limitations in elevated work (good shoulder accessory muscle use and effort), forward bending – standing (did not tolerate forward bend position well) and standing work (standing time diminished; better if he can bear more weight into his heels and shift weight often). (R. 488). He could rarely crouch (sweating, leg shaking, poor tolerance). (R. 489). He could frequently climb stairs (descent worse than ascend). (Id.). For the six minute walk test, Plaintiff was occasionally limited (he could not walk when tested for more than two minutes, he was able to stay in a mobile upright position for twenty-nine minutes without a sitting break, he reported pain in the back of his legs, weight-bearing was less on the right lower extremity). (Id.). No push/pull or hand function limitations were noted. (Id.).

The FCE Physical Exam noted slow gait, rounded shoulders, sits comfortably and moves easily, some days walking is regular, atrophy in legs but not swelling. (R. 490). The exam of the musculoskeletal systems noted normal range of motion and strength of the neck, trunk, shoulder, elbow, forearm, wrist and knee. (R. 490-91). His hip had normal range of motion but some decreased strength, particularly on the right. (R. 491). Plaintiff's range of motion and strength was limited on the right ankle but normal on the left ankle. (R. 492). He was only able to balance for five seconds on the right and nine seconds on the left. (Id.). He tends to lean forward when his sensation is comprised and does not like being in backward leaning position due to this. (Id.). Dr. Anderson noted that "his results were very consistent here in regards to sensation impairment in the lower extremities." (Id.).

### c. Caroline Williams, M.D., April 14, 2011

On October 5, 2010, Dr. Williams, a State Agency medical consultant, filled out a Physical Residual Functional Capacity Assessment form regarding Plaintiff's limitations. (R. 474-81). Under the exertional limitations section of the assessment, Dr. Williams wrote that Plaintiff was able to occasionally lift and/or carry (including upward pulling) 50 pounds, to frequently lift and/or carry (including upward pulling) 25 pounds, to stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday, to sit (with normal breaks) for about 6 hours in an 8-hour workday, and to push and/or pull (including operation of hand and/or foot controls) an unlimited amount, other than as shown for lift and/or carry. (R. 475). Under the postural limitations section of the assessment, Dr. Williams concluded that Plaintiff was able to frequently climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. (R. 476). Under the environmental limitations section of the assessment, Dr. Williams asserted that Plaintiff was able to maintain unlimited exposure to extreme cold, extreme heat,

wetness, humidity, noise, and fumes. (R. 478). However, Plaintiff was to avoid concentrated exposure to vibration and hazards such as machinery and heights. (Id.). There were no manipulative, visual, or communicative limitations established. (R. 477-478).

Ms. Williams concluded that there was no evidence of neuro deficit; chronic pain and narcotic use. (R. 481). She found Plaintiff to be partially credible and that his reported activities of daily living were out of proportion to the medical findings but she did reduce the RFC. (Id.). Ms. Williams also referenced a November 10, 2010 OV Note signed by Dr. Fergus which stated he would allow Plaintiff to return to work. (R. 480).

### d.  Karoly Varga, M.D., October 21, 2012

On October 21, 2012, Dr. Varga submitted a letter to Plaintiff's counsel, Jan Dils, Esq., regarding Plaintiff's conditions, treatment and prognosis. (R. 946-47). Dr. Varga first began seeing Plaintiff at City Hospital on August 22, 2010 and after appropriate workup, Dr. Varga confirmed LS radiculopathy, which indicated surgical intervention. (R. 946). Plaintiff started symptomatic pain management and was evaluated for and eventually underwent surgery by Dr. Fergus (Winchester). (Id.). Following the surgery, Dr. Varga treated Plaintiff on a regular basis. (Id.). Dr. Varga explained that while the lower back surgery was successful for his lower back pain, he still experienced severe feet and leg pain. (Id.). Dr. Varga then confirmed neuropathy by conducting an electrodiagnostic test, which showed severe chronic axonal sensory-motor peripheral polyneuropathy, completed with chronic bilateral multilevel LS radiculopathy. (Id.). The etiology of the neuropathy was established as diabetes mellitus. (Id.). Additional diabetic complications included gastroparesis and nephropathy. (Id.). He also showed signs of depression. (Id.).

Dr. Varga concluded that these conditions, besides the severe pain, resulted in "balance

problem[s], walking difficulties, limited exercise tolerance." (Id.). Due to these problems, he experienced a severe fall, which resulted in a broken ankle and exacerbation of lower back pain. (Id.). Dr. Varga further noted that a formal "Functional Capacity Evaluation" from January 6, 2011, confirmed "impaired balance, struggles with walking, squatting and lifting." (Id.).

Dr. Varga further explained that her last evaluation occurred on September 27, 2012. (R. 947). At that time, Dr. Varga found that Plaintiff suffered from chronic LS radiculopathy, failed back syndrome, severe peripheral polyneuropathy with autonomic complications and clinical signs of depression. (Id.). Dr. Vargas concluded Plaintiff was severely limited in his physical abilities due to his chronic medical conditions. (Id.).

## C.    Testimonial Evidence

At the ALJ hearing on February 28, 2013, Plaintiff testified that he was forty-one years old, unmarried, and not working. (R. 183-85). Plaintiff testified that he lives with his father. (R. 183). He relies on family to support him financially; his father receives social security. (R. 185). He had not worked since November 23, 2009, when he first injured his back. (R. 184).

Plaintiff went on to testify that his back pain was caused by two discs that slipped while he was sleeping on August 20, 2010. (Id.). He described the pain as shooting down both legs. (R. 186). Plaintiff also testified that he experiences spasms in his legs every day. (R. 187). He stated that some spasms are so bad that he cannot sleep at night and last all day. (R. 186). He attempts to relieve the pain by rubbing his legs. (Id.). Plaintiff further testified that pain medications do not help these types of spasms, which occur on three to four days per month. (R.187).

Plaintiff proceeded to testify that his back pain affects the activities that he can engage in around the home. (R. 188). He states that he can stand up and wash the dishes, as well as a "little bit of dusting." (Id.). Plaintiff stated, though, that he is unable to carry anything because his

balance and strength are affected and even needs help carrying a gallon of milk. (<u>Id.</u>). Plaintiff testified that the pain starts in the middle of his lower back and down. (R. 189). He stated the pain "rarely shoots up," but that he does occasionally experience a "frozen shoulder." (<u>Id.</u>). Plaintiff stated that the frozen right shoulder has occurred three times and lasts for a period of about three days. (R. 189-90). His doctors have been unable to diagnose the impairment. (R. 190). Plaintiff testified that he was able to drive every other day or every two days; he drives to doctor appointments or to the grocery store. (R. 184). Plaintiff has a dog and takes care of him the "best I can." (R. 185).

Plaintiff also testified that the pain he experiences interferes with his ability to concentrate. (R. 192). He stated that the longest that he could read before having problems was three to five minutes. (R. 193). The pain also impacts him physically. Plaintiff stated that standing is worse than walking, and he can only stand for five to six minutes at a time. (<u>Id.</u>). Plaintiff testified that sitting was better, but he could only do so for twenty to forty minutes, before having to get up and stretch. (<u>Id.</u>). He further testified that the pain could not be relieved and that he "gave up" on the pain medication because it made him sick. (<u>Id.</u>).

Further, Plaintiff testified that he tried to manage his pain, but that the pain cannot be relieved. (R. 193-94). He tries to nap for two to four hours per day, but does not sleep most of the time. (R. 194). He explained that he had tried using pillows, heating pads, and back braces, but that none of them have helped to relieve the pain. (<u>Id.</u>). Plaintiff further testified that surgery is not an option because of the nerve damage. (<u>Id.</u>). He explained that his neurologist, Dr. Varga, told him the pain is just something that Plaintiff will have to "buckle down and deal with it." (<u>Id.</u>).

Next, Plaintiff testified about his issues with gout. (R. 190). He had recently experienced a "flare up" and was again taking Trazadone and Colcrys. (Id.). Plaintiff stated that the flare ups occur "once every couple months." (R. 191). He said that the gouts affects his ability to walk even more and only occurs in the foot and ankles. (Id.). However, when he does not experience the flare ups, Plaintiff stated that he does not experience any symptoms of gout. (Id.).

Further, Plaintiff testified that he was receiving treatment for depression and hyperactivity. (R. 191). He stated that some days he did not want to get out of bed. (Id.). He further said that some days he wished he would "never wake up and let it all be over with." (R. 192). Plaintiff said that the depressive symptoms occurred about five days per week. (Id.).

Plaintiff testified that he had surgery for diabetic retinopathy performed on his right eye. (R. 195). Prior to surgery, he had gone "blind" for three months and his whole eye went blurry. (Id.). Plaintiff said that he is able to see now with the aid of corrective lenses, but that his vision is still poor. (Id.). He also said that the doctor told him the same condition would eventually affect his left eye. (Id.). Plaintiff explained that he has no lasting symptoms, but that he does occasionally get headaches and little black spots in his vision when he concentrates too hard. (R. 196).

**D.  Vocational Evidence**

Also testifying at the hearing was Mary Beth Coppard, a vocational expert ("VE"). Ms. Coppard characterized Plaintiff's work history as a painter as skilled, medium exertion for the DOT, but heavy exertion as performed. (R. 199).

The ALJ then questioned the VE about the availability of jobs in the national economy that could be performed by a person with the following hypothetical:

> Q:      Ms. Coppard, if we assume a hypothetical individual of the same age
>           range as the claimant, younger individual with a ninth grade education and

ninth grade or limited education and with the same work experience as the claimant. If we further assume the individual is able to perform sedentary work with occasional, as described in the Social Security Regulations, with occasional climbing, . . . ramps and or stairs, never climbing ropes, ladders, or scaffolds. Occasionally stooping, balancing, kneeling, and crawling. The individual should avoid concentrated exposure to extreme heat, cold, wetness, and humidity, and avoid all exposure to hazardous machinery and heights. . .And, if given those limitations or abilities, would the individual be able to perform any other work?

A:      Yes, your honor. He could do that of an order clerk. DOT 209.567-014. Unskilled, SVP of 2. Sedentary exertion. Over 300,000 positions in the national economy. Approximately 3,000 in the local regional. He could do that. . .

A:      He could do that of a polisher. DOT 713.684-038. Unskilled, SVP of 2. Sedentary exertion. Over 80,000 positions in the national economy. Approximately 500 in the local regional. He could do that of an addresser. DOT 209.587-010. Unskilled, SVP of 2. Sedentary exertion. With over 50,000 positions in the national economy. Approximately 250 regional.

(R. 199-200). The ALJ then added to the hypothetical and questioned the availability of the

previously mentioned positions:

Q:      Okay. In my next hypothetical, if the individual would need to perform work that would not involve reaching overhead, would that affect any of the jobs that you gave me?

A:      No, your honor.

Q:      And that would be on the right side. Okay. And that would be on the right dominant arm. Would there, there would be, that would not affect the jobs, correct?

A:      Correct.

Q:      Okay. And if I added to hypos one or two that psychological symptoms or other symptoms would result in the individual being able to, be able to understand and carry out simple instructions and perform simple routine work. Would that individual be able to do the jobs that you listed?

A:      That they would be able to do simple routines, correct?

Q:      Yes.

A:     Yes, they could still do the same positions.

Q:     Okay. And, next hypothetical. If the individual, due to a combination of symptoms including pain, and swelling in the extremities as well. Well, primarily pain and swelling in the extremities, that the individual would miss work at least two or more days. Strike that. Would miss work three or more days a month. Would that individual, on a consistent basis, would that individual be able to perform any work?

A:     No, your honor.

(R. 201-02). The VE stated that this testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 202). Plaintiff's attorney declined to question the VE. (Id.).

## E.     Report of Contact Forms

On September 22, 2010, Plaintiff filled out a Work History Report, which he indicated that he worked as a painter from 1986 to 2010. (R. 345). He frequently lifted twenty-five to fifty pounds, with the heaviest weight lifted ranging from fifty to 100 pounds or more. (R. 347-51). In another report, Plaintiff stated his painting position required him to walk, stand, climb, crouch, kneel, reach, and handle large and small objects. (R. 360-61). He further stated that he quit working because of his condition. (R. 359).

On November 5, 2010, Jason Preston completed a Report of Contact form. (R. 365). Plaintiff's physical residual capacity was light, which would exclude his past work as a painter. (Id.). However, based on the limitations, namely that Plaintiff is a younger individual with a tenth grade education and light RFC, other work could be performed in the national economy. (Id.). This work includes the positions of produce weigher, silver wrapper, and ironer. (Id.).

On April 14, 2011, Jonathan Merrifield completed a Report of Contact form. (R. 373). Merrifield indicated that Plaintiff could perform work at the medium exertion level, with environmental restrictions; accordingly, Plaintiff could perform his past work as a painter as described in the national economy, not as actually performed by Plaintiff. (Id.).

**F.    Lifestyle Evidence**

On September 10, 2010, M. Mitchell completed a Disability Report after an in-person meeting with Plaintiff. (R. 342-44). Plaintiff reported difficulty with sitting, standing, and walking. (R. 343). Mitchell noted that Plaintiff used a walker and seemed distressed. (Id.). In an undated Disability Report, Plaintiff reported severe lumbar pain in the L4-L5 level, as well as a bulging disc. (R. 362). Plaintiff reported that he was taking five medications, all prescribed by Panhandle Neurology: Enalapril for blood pressure; Lantus for diabetes; Percocet for pain management; Prednisone; and Valium for pain management. (Id.). In a second undated Disability Report, Plaintiff reported no change in his condition. (R. 368-372). His medications include hydrocodone and oxycodone for pain. (R. 370). Plaintiff also stated that he "can no longer do the things [he] used to do," and that he needs assistance at home because of the pain and numbness in his lower extremities. (Id.). In another undated Disability Report, Plaintiff reported that his pain had increased severely, beginning on March 1, 2011. (R. 384-88). (R. 384). He no longer had the energy to care for himself, complete household chores, or participate in daily activities. (R. 386).

On September 22, 2010, Plaintiff completed a Personal Pain Questionnaire. (R. 353). He indicated that he experiences aching and throbbing in his back and legs "all the time." (Id.). Plaintiff also reported that he was unable to walk correctly, but that pain medications relieve the pain. (Id.). Plaintiff reported that twisting, bending, and coughing makes the pain worse, but, again, that pain medications help relieve the pain. (R. 355). Plaintiff reported, however, that the pain medications do cause drowsiness. (R. 354).

On April 17, 2011, Plaintiff completed an Adult Function Report. (R. 374). He reported that his condition prevented him from doing any work. (Id.). Plaintiff reported that he was

formerly employed as a "union painter" for sixty hours per week. (R. 375). When describing his daily activities, Plaintiff stated that he can only sleep for one hour at a time before the pain causes him to wake and shift. (<u>Id.</u>). Plaintiff lives with his father and indicated that his father helps him care for animals and other people. (<u>Id.</u>). Plaintiff also said that he does "nothing" from the time he wakes up until he goes to bed because he is waiting to undergo surgery. (<u>Id.</u>).

For personal care, Plaintiff reported that his condition makes it difficult to put on shoes and socks, to stand in the shower, and to use the toilet. (<u>Id.</u>). Plaintiff prepares meals every day but this takes "a while" due to his use of a walker. (R. 376). He also stated that he was unable to complete household chores or yard work. (<u>Id.</u>). Plaintiff did report that he is able to walk outside and goes outside "every day." (R. 377). He does not drive. (<u>Id.</u>). He indicated he goes grocery shopping roughly once every two weeks, but that it takes him "a long time." (<u>Id.</u>). He reported an inability to pay bills, handle a savings account, or use a checkbook. (<u>Id.</u>). He did, however, report that he is able to count change. (<u>Id.</u>).

Plaintiff did not name any hobbies or interests, but stated that he is unable to fish anymore, and that he tries to spend time with others. (R. 378). He reported that he attends church, but indicated that he needs someone to accompany him. (<u>Id.</u>). He stated that his condition changed "everything [he] do[es]," in reference to his social activities. (R. 379). He stated he has problems getting along with others because he is "sumtimes [sic] . . . in a bad mood." (<u>Id.</u>).

In regard to abilities, Plaintiff indicated that his back and leg pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others. (<u>Id.</u>). He stated that he can only walk twenty feet before needing to rest for ten minutes. (<u>Id.</u>). Plaintiff said that he was

taking Ritalin for ADD/ADHD, and that he does not finish activities that he starts. (Id.). He also reported difficulty in following instructions, spoken or written, because the pain "sumtimes [sic] takes over." (Id.). Plaintiff further reported that he was prescribed a walker, which he used regularly, on August 25, 2010. (R. 380). Finally, Plaintiff reported taking two medications, with side effects of "feel[ing] slow[ed] down." (R. 381).

## IV. <u>THE FIVE-STEP EVALUATION PROCESS</u>

To be disabled under the Social Security Act, a claimant must meet the following criteria: An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i)     At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii)    At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii)   At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv)     At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v)     At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2.     The claimant has not engaged in substantial gainful activity since November 23, 2009, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine s/p hemi-laminectomy and discestomy in October of 2010 and residual chronic bilateral lumbosacral radiculopathy and chronic polyneuropathy, diabetes mellitus; gout, left frozen shoulder syndrome as of October 14, 2012, gatro-paresis post drainage in 2012, gastro-esophageal reflux disease (GERD), nephropathy, a major depressive disorder with a global assessment of functioning (GAF) at 55; an attention deficit hyperactivity disorder (ADHD) by history only, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except due to his musculoskeletal problems, he is limited to occasional climbing of ropes, ladders and scaffolds.  He can occasionally stoop, balance, kneel, crouch, and crawl.  He cannot perform work involving over-head reaching.  The claimant must avoid concentrated exposure to extreme temperatures of heat, cold, wetness, and humidity.  He must also avoid concentrated exposure to hazardous machinery and working at heights.  Due to psychologically based symptoms, he is able to understand and carry out simple instructions and perform simple, routine work.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on April 17, 1971, and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564, 20 CFR 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 23, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 163-173).

# VI.  <u>DISCUSSION</u>

## A.      Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her motion for summary judgment, asserts that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges that:

- The ALJ failed to comply with 20 CFR 404.1527 and 416.927 in assigning "little weight" to the opinion of treating neurologist, Karoly Varga, M.D.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 9, ECF No. 13). Plaintiff asks the Court to reverse the Commissioner's decision or alternatively remand the case to the Commissioner to correct his errors. (Id. at 15).

Defendant, in her motion for summary judgment, asserts that the decision is supported by substantial evidence and should be affirmed as a matter of law. (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- The ALJ properly discounted Dr. Varga's opinion as conclusory. Regardless, Dr. Varga's opinion did not identify any functional limitations inconsistent with the sedentary jobs identified.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 12-13).

## C.     Analysis of the Administrative Law Judge's Decision

### 1.     Whether the ALJ Properly Consider Dr. Varga's Treating Source Opinion

Plaintiff only raises one claim for relief. He asserts that the ALJ erred by assigning little weight to the opinion of Dr. Varga and that the ALJ failed to give good reasons why he assigned Dr. Varga's opinion little weight as is required by 20 C.F.R. §§ 404.1527 and 416.927. (Pl.'s Br. at 9-13). Specifically, Plaintiff argues the ALJ's analysis failed to address Dr. Varga's longitudinal relationship treating Plaintiff, her specialization as a neurologist, or the support and consistency his opinion had based on the record. (Id. at 13). Instead, the ALJ improperly rejected Dr. Varga's opinion because it was conclusory and failed to set forth specific limitations. (Id. at 13). Plaintiff further argues that if the ALJ believed Dr. Varga's opinion was inadequate to make a disability determination, the ALJ could have requested additional information but failed to do so. (Id. at 12).

Defendant argues that the ALJ properly discounted Dr. Varga's opinion as conclusory. (Def.'s Br. at 1-2). Defendant explains that Dr. Varga only stated that Plaintiff's "chronic

medical conditions severely limit the physical abilities of [Plaintiff,]" but that she failed to identify any specific limits. (Id. at 12). Further, Defendant argues that "Plaintiff has failed to identify any functional limitations assessed by Dr. Varga that were not incorporated into the RFC." (Id. at 11). As such, Dr. Varga's opinion was not inconsistent with the ALJ's finding that Plaintiff could perform sedentary work. (Id.).

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5. However, "a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Charter, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).

When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This explanation may be brief.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one). Moreover, as the Fourth Circuit explained:

> The courts…face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). As such, in weighing opinion evidence, the ALJ must sufficiently explain the weight given to the opinion.

At issue is the October 21, 2012 treating source opinion of Plaintiff's neurologist, Dr.

Varga. (R. 946-47). As to this opinion, the ALJ stated in full: "The undersigned also consider the opinion of Dr. Varga, a treating physician, at Exhibit 18 F, and gives it little weight. It was a conclusory opinion stating the claimant's physical abilities were severely limited, setting forth [sic] any specific limitations." (R. 171). Here, the ALJ did not make a finding as to whether Dr. Varga's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques or whether it was inconsistent with other substantial evidence in the case record as required by 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2). Instead, the ALJ referred to Dr. Varga's opinion in a summary fashion without referencing a single piece of evidence with which it was inconsistent or referencing any of the factors outlined in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). See Chandler v. Comm'r of Soc. Sec., No. 3:14CV19, 2014 WL 2998597, at *13 (N.D.W. Va. June 11, 2014). Even though an ALJ is not required to list and address each factor in his decision, the ALJ must still provide sufficient reasons or the weight assigned. See Pinson, 2009 WL 763553, at *11. The ALJ further failed to provide sufficient reasons for assigning little weight to Dr. Varga's opinion because the opinion did include limitations and problems associated with Plaintiff's conditions.

In assigning little weight to Dr. Varga's opinion, the ALJ generally stated that Dr. Varga's opinion was "conclusory" and failed to set forth any specific limitations. (R. 171). However, Dr. Varga's opinion states that Plaintiff's conditions resulted in "balance problem[s], walking difficulties, limited exercise tolerance." (R. 946). Dr. Varga further opined that these problems resulted in a severe fall and exacerbation of lower back pain. (Id.). Dr. Varga then referred to a Functional Capacity Evaluation performed by WorkWell Systems, Inc. on January 6, 2011, which "confirmed impaired balance, struggles with walking, squatting and lifting." (Id.).

Dr. Varga then concluded that "these chronic medical conditions severely limit the physical abilities of the patient." (Id.).

Defendant points to two district court cases in support of the proposition that an ALJ may reject a treating source opinion as conclusory when it fails to set forth specific limitations. (Def.'s Br. at 12). Defendant's reliance on Mathis and Adkins is misplaced. In Mathis, the court notes that "Dr. Nixon's opinion does not identify any specific limitations, other than decreased stamina, which resulted from Plaintiff's impairments." Mathis v. Astrue, No. 2:09CV034, 2011 WL 3515467, at *6 (W.D.N.C. Aug. 11, 2011). In Adkins, the physician merely "noted that Plaintiff was a 'moderate fall risk," and opined that due to the chronicity of her pain and stiffness "she will be limited in her functioning.'" Adkins v. Colvin, No. 4:13-CV-00024, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014). Unlike these two cases, Dr. Varga did include specific limitations on Plaintiff's physical abilities: problems with balancing, walking and exercising. (R. 946).

Even though Dr. Varga did not complete a formal physical residual functional capacity evaluation or provide quantitative limitations regarding Plaintiff's physical work-related abilities, Dr. Varga did note limitations in the opinion. (R. 946). While Dr. Varga's opinion includes her conclusion that Plaintiff's medical conditions "severely limit the physical abilities" (R. 947), she also noted limitations and problems associated with Plaintiff's conditions, specifically "balance problems, walking difficulties, limited exercise tolerance." (R. 946). In addition to these limitations, Dr. Varga's opinion included a basis of her treatment for Plaintiff's conditions since August 2010 and noted the results of objective medical testing used to confirm diagnoses. (Id.). These findings were consistent with Dr. Varga's treatment notes, which showed that Plaintiff had decreased dorsi- and planter flexion, decreased sensation on both feet, antalgic gait with left

sided limp, negative tandem walk, positive straight leg raise test on both sides, spastic and painful LS paraspinal muscles and painful and/or swollen feet. These physical examination findings support Dr. Varga's opinion that Plaintiff was limited in balancing, walking and exercising.

In rejecting Dr. Varga's opinion, the ALJ did not outline any specific treatment notes that were inconsistent with Dr. Varga's opinion. The ALJ failed to discuss any of the factors outlined in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ further failed to provide sufficient reasons for the weight assigned by rejecting Dr. Varga's opinion for being conclusory and not setting forth any specific limitations, when the opinion in fact noted Plaintiff's conditions resulted in balance problems, walking difficulties and limited exercise tolerance. After reviewing the record, the undersigned finds that the ALJ failed to provide sufficient reasons for finding that Dr. Varga's opinion was entitled to little weight.

Nevertheless, the undersigned finds that such error is harmless. The ALJ's RFC adequately covered Plaintiff's limitations as opined by Dr. Varga by limiting Plaintiff to sedentary work with postural limitations:

> …the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except due to his musculoskeletal problems, he is limited to occasional climbing of ropes, ladders and scaffolds.  He can occasionally stoop, balance, kneel, crouch, and crawl.  He cannot perform work involving over-head reaching….

(R. 169). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). By limiting Plaintiff to sedentary work with postural limitations, the ALJ's RFC adequately incorporates the limitations referenced

by Dr. Varga. Dr. Varga's opinion does not include details indicating the existence of greater limitations on Plaintiff's ability to walk or balance than those already included in Plaintiff's limited RFC. As such, Dr. Varga's opinion citing generalized limitations in walking, balancing and exercise are consistent with the ALJ's sedentary RFC with postural limitations, including only occasionally balancing. Accordingly, because Dr. Varga's opinion as to Plaintiff's limitations are consistent with the ALJ's RFC, the ALJ's failure to give sufficient reasons for assigning less weight to Dr. Varga's opinion is harmless error. See Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005) ("Any error the ALJ may have made in rejecting Dr. Holford's medical opinion, which provided essentially the same time restriction on sitting and standing as the FCE, was therefore harmless."); Rivera v. Colvin, No. 5:11-CV-569-FL, 2013 WL 2433515, at *3 (E.D.N.C. June 4, 2013) ("[A]n ALJ's failure to expressly state the weight given to a medical opinion may be harmless error, when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination."); Bautista v. Astrue, Civil No. TJS-11-1651, 2013 WL 664999, at *6 (D. Md. Feb. 22, 2013) ("Assuming, for the sake of argument, that the ALJ erred by failing to assign weight to all of the opinion evidence in the record, the error could not have affected the outcome of the proceedings.").

As such, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). In sum, the undersigned finds that the ALJ erred by not providing sufficient reasons for assigning little weight Dr. Varga's opinion as

discussed above. However, the undersigned finds that the limitations referenced in Dr. Varga's opinion, including limitations on walking, balancing and exercising, are consistent with the ALJ's ultimate RFC limiting Plaintiff to sedentary work with only occasional balancing and other postural limitations. Accordingly, the ALJ's error is harmless.

Lastly, the Court addresses Plaintiff's argument that the ALJ was required to seek out additional information from Dr. Varga if the ALJ believed the opinion to be inadequate. (Pl.'s Mot. at 12). In support of his argument, Plaintiff cites 20 C.F.R. §§ 404.1512(e) and 416.912(e):

> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolve, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

(Id. at 12-13). However, the regulations upon which Plaintiff relies upon were eliminated from the regulations on March 25, 2012. See Williamson v. Colvin, No. CA 8:12-2887-JFA-JDA, 2014 WL 1094404, at *16 n.8 (D.S.C. Mar. 18, 2014) ("Effective March 26, 2012, the Commissioner amended 20 C.F.R. § 404.1512 to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances."). The new regulatory sections state: "We *may* recontact your treating physician, psychologist, or other medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence." 20 C.F.R. §§ 404.1520b and 416.920b (emphasis added). As another district court explained:

> the regulations, which in the past required an ALJ to recontact a treating medical source in certain circumstances (20 C.F.R. § 404.1512, § 416.912) were modified in 2012. *See* 77 F.R. 10656. The new sections allow SSA to determine the best way to resolve any inconsistency or insufficiency, and also explain that the ALJ may recontact the medical source, but is not required to do so.

Henry-Henson v. Colvin, No. 4:12CV1773 HEA, 2014 WL 636325, at *3 (E.D. Mo. Feb. 18, 2014). Accordingly, the ALJ was not required to re-contact Plaintiff's treating source physician. See Winder v. Astrue, No. 1:11CV956 LMB/TRJ, 2012 WL 4461284, at *4 (E.D. Va. Sept. 24, 2012) (rejecting the plaintiff's argument that the ALJ was obligated to re-contact a treating source for further clarification and holding that "such action by the ALJ [is] permissive, not mandatory."). Therefore, the Court finds that the ALJ did not err because the ALJ was not required to re-contact Dr. Varga to obtain further clarification of his opinion.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE.**

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 19th day of June, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE